[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11627

_____

D.C. Docket No. 1:13-cv-00941-RWS-ECS

DERRICK BAILEY,

Plaintiff - Appellee,

versus

MAJOR TOMMY WHEELER,
in his individual and official capacity,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 28, 2016)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and URSULA
UNGARO,[*] District Judge.

---

[*] The Honorable Ursula Ungaro, United States District Court for the Southern District of
Florida, sitting by designation.

ROSENBAUM, Circuit Judge:

The be-on-the-lookout advisory ("BOLO") to all law enforcement in Douglas County, Georgia, described its subject as a "loose cannon." "Consider this man a danger to any [law-enforcement officer] in Douglas County and act accordingly," the BOLO alarmingly warned and ominously instructed.

What had the subject of the BOLO done to trigger such a grave alert? Had he threatened law enforcement or the public? Had he broken any laws? Was he mentally unstable? Had he been acting at all suspiciously? No, no, no, and no.

Instead, Plaintiff-Appellee Derrick Bailey, the subject of the BOLO, had wielded the mightiest weapon of them all: the pen.[1] An officer of the Douglasville Police Department, Bailey had filed a written complaint with his chief, reporting that other Douglasville officers and Douglas County Sheriff's Office deputies had been racially profiling minority citizens and committing other constitutional violations.[2]

Bailey's revelations did not go over well in Douglas County's law-enforcement community. Indeed, several months later, Bailey found himself without a job.

---

[1] "The pen is mightier than the sword." EDWARD BULWER-LYTTON, RICHELIEU; OR, THE CONSPIRACY, act 2, sc. 2 (1839).

[2] Bailey uses the term "minority citizens" to describe the individuals against whom law enforcement was committing constitutional violations. We adopt his terminology for purposes of this opinion.

But that did not silence Bailey. Instead, Bailey filed an appeal with the City of Douglasville, again reporting constitutional violations by his fellow officers. The City held a hearing on Bailey's appeal. And the very next day, Defendant-Appellant Major Tommy Wheeler of the Douglas County Sheriff's Office issued a county-wide alert to all law-enforcement officers, picturing Bailey, warning that he was a "loose cannon" who presented a "danger to any [law-enforcement officer] in Douglas County," and directing officers to "act accordingly."

Bailey did not sit idly by. He sued Wheeler and others, asserting, among other causes of action, a claim under 42 U.S.C. § 1983 for violation of his First Amendment rights and a claim under Georgia law for defamation. When Wheeler sought to dismiss these claims, the district court denied his motion. We now affirm.

## I.

## A.

Bailey had more than seventeen years of law-enforcement experience when he joined the City of Douglasville Police Department ("Police Department") as a police officer in March 2010.[3] So it is not surprising that between May 2010 and

---

[3] On a motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Randall v. Scott*, 610 F.3d 701, 704 (11th Cir. 2010). For this reason, we take our factual recitation from Bailey's operative complaint.

June 2012, Bailey received above-average employee performance appraisals from his supervisors.

But Bailey's time employed with the Police Department was far from perfect. On April 26, 2011, Bailey filed a written complaint with his chief, reporting that Police Department officers and Douglas County Sheriff's Office ("Sheriff's Office") deputies were racially profiling minority citizens and committing other constitutional violations. Bailey also complained that law-enforcement officers made racially offensive comments and jokes about minorities, describing black males as "black as shoe polish wearing all black" and remarking that the City of Douglasville's ("City") logo was a "lynching tree."[4] Finally, Bailey expressed concern that he would lose his job for "making the complaints and speaking out about racial profiling and other violations."

Although repercussions of Bailey's complaint did not follow immediately, in the fall of 2012, Bailey's supervisors ordered Bailey to rewrite incident reports that he had previously filed, and they conducted an investigation of Bailey. When Bailey reminded his supervisors that rewriting incident reports violated Police

---

[4] The seal of the City of Douglasville appears below:



http://www.ci.douglasville.ga.us/ (last visited Nov. 21, 2016).

4

Department policy, he was initially placed on administrative leave with pay, then suspended for three days without pay, and then charged on November 8, 2012, with conduct unbecoming an officer.[5] Eight days later, though Bailey had no prior write-ups or reprimands on his record, Bailey was terminated from his position with the Police Department.

Two days after that, on November 18, 2012, Bailey appealed his termination to the City. In his appeal, Bailey wrote that he believed that he was fired for speaking out against profiling, other unconstitutional conduct, and racially offensive remarks made by that Police Department officers and Sheriff's Office deputies.

The City held a hearing on Bailey's appeal on February 8, 2013. That very night, two deputies in a Sheriff's Office vehicle followed Bailey as he drove his personal car from Douglasville into the City of Atlanta. When Bailey entered his intended destination, the two deputies followed him in and stared him down.

Things did not improve for Bailey. The next day, February 9, 2013, Wheeler issued the BOLO on Bailey, displaying Bailey's photograph, calling him

---

[5] The U.S. Department of Justice Office of Community Oriented Policing Services, in conjunction with the International Association of Chiefs of Police, has defined "conduct unbecoming" as "[a] term of administration regarding misconduct by law enforcement officers that usually applies to distasteful and undesirable conduct that is not clearly criminal or corrupt." U.S. Dep't of Justice & Int'l Ass'n of Chiefs of Police, *An Internal Affairs Promising Practices Guide for Local Law Enforcement*, at 42, http://www.theiacp.org/portals/0/pdfs/buildingtrust.pdf (last visited Nov. 21, 2016).

a "loose cannon," and warning law-enforcement officers to "[c]onsider this man a danger to any [law-enforcement officer] in Douglas County and act accordingly." And for the second day in a row, law enforcement—this time vehicles from both the Sheriff's Office and the Police Department—followed Bailey as he drove his personal car.

About three weeks went by, and Bailey was permitted to return to work at the Police Department. At that time, the Police Department's chief advised Bailey that Bailey could cancel the BOLO against him by calling the Sheriff's Office.

## B.

On March 25, 2013, Bailey filed this lawsuit. In the course of pretrial litigation, Bailey filed a second amended complaint. As it pertained to Wheeler,[6] the second amended complaint alleged four causes of action, including, as relevant here, a claim that, in violation of 42 U.S.C. § 1983, Wheeler had retaliated against Bailey for exercising his First Amendment rights, and a claim that Wheeler had defamed Bailey under Georgia law.

Wheeler moved to dismiss the counts against him, contending that Bailey had failed to state a claim and that, in any event, Wheeler was entitled to qualified immunity on the § 1983 claim and official immunity on the defamation claim. The

---

[6] Bailey also sued the City and other officers and deputies. Ultimately, however, Bailey voluntarily dismissed the claims against them with prejudice, pursuant to an agreement among those parties.

district court denied Wheeler's motion as it pertained to the First Amendment and defamation claims.[7] Wheeler now appeals.

## II.

We have jurisdiction to review Wheeler's interlocutory appeal of the district court's denial of qualified immunity and official immunity. *Cummings v. DeKalb Cty.*, 24 F.3d 1349, 1352 (11th Cir. 1994).

We review *de novo* a district court's denial of qualified immunity on a motion to dismiss. *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013). We likewise review *de novo* the denial of official immunity under Georgia law. *Hoyt v. Cooks*, 672 F.3d 972, 981 (11th Cir. 2012). In doing so, we accept as true the facts alleged in the complaint, drawing all reasonable inferences in a plaintiff's favor. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).

## III.

Section 1983 of Title 42, United States Code, creates a private right of action to remedy violations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Rehberg v. Paulk*, 132 S. Ct. 1497, 1501 (2012). The cause of action is available against "[e]very person who acts under color of state law to deprive another of a constitutional right." *Id.* (citation and internal quotation marks omitted). To establish a claim under § 1983, a

---

[7] As it related to other claims against Wheeler, the district court granted Wheeler's motion to dismiss. Bailey did not cross-appeal, so we do not discuss those claims here.

7

plaintiff must demonstrate that a person acting under color of state law deprived him of a federal right. *Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013).

But even if a plaintiff makes this showing, a defendant may seek to invoke the protections of qualified immunity. Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action. *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015).

To be eligible for qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, Bailey does not dispute that Wheeler was acting within the scope of his discretionary authority when he issued the BOLO against Bailey.

So the burden shifts to Bailey, as the plaintiff, to establish that qualified immunity does not apply. *Id.* To do this, Bailey must make two showings: first, he must demonstrate that Wheeler's issuance of the BOLO violated Bailey's constitutionally protected right. Second, he must show that the right was clearly established at the time that Wheeler issued the BOLO. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010). Bailey must satisfy both prongs of the analysis to overcome a defense of qualified immunity. *See Grider*, 618 F.3d at 1254.

8

## A.  Wheeler violated Bailey's First Amendment rights

Bailey alleges that Wheeler issued the BOLO against him to punish Bailey for reporting law enforcement's unconstitutional treatment of minority citizens.  To state a claim for retaliation under the First Amendment, a plaintiff must demonstrate that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions.  *See Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

Wheeler does not contend that Bailey failed to establish the first element[8]— that he engaged in protected speech.  Instead, Wheeler argues that Bailey's First

---

[8] We agree with Wheeler's implicit concession that Bailey alleged sufficient facts to show that he engaged in protected speech when he complained to his chief, and again in his termination appeal, that Douglas County law-enforcement officers were involved in racial profiling and other inappropriate and unconstitutional conduct.  The Supreme Court has emphasized that public employees do not forfeit all their First Amendment rights by simple virtue of their public employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419.  Clearly, if officers are systematically violating minority citizens' constitutional rights, that is a matter of public concern.  Nor does it matter that Bailey expressed concerns related to law enforcement when he was an officer or that he did so to his chief, instead of publicly. *See id.* at 420-21.  Indeed, law-enforcement officers are "members of a community most likely to have informed and definite opinions" on appropriate law-enforcement conduct. *See id*. (citation and internal quotation marks omitted).  For this reason, "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* (citation and internal quotation marks omitted).  Rather, the "controlling factor" is whether the public employee made his expressions pursuant to his specific job duties. *Id.*  If he did not, he engaged in protected speech.  Here, nothing in the record demonstrates that one of Bailey's duties as a police officer

9

Amendment claim fails under the second prong because, in Wheeler's view, the BOLO he issued was unlikely to deter a person of ordinary firmness from exercising his First Amendment rights. Wheeler also asserts that it fails under the third prong for two reasons: (1) Bailey did not allege that he expressed his concerns about racial profiling and other inappropriate and unconstitutional behavior by law-enforcement officers to anyone at the Sheriff's Office, and (2) Bailey failed to aver any facts that would allow the inference that Wheeler acted with the motive of retaliating against Bailey for exercising his First Amendment rights.

We begin with the second element—whether Wheeler's conduct adversely affected Bailey's protected speech. In this Circuit, we have explained that a defendant adversely affects protected speech if his alleged retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254. We use this objective standard because it gives government officials notice of when their retaliatory actions violate a plaintiff's First Amendment rights. *Id.* at 1251.

In this case, we readily conclude that Wheeler's BOLO "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." First, the BOLO described Bailey as a "loose cannon" who was a "danger to any [law-

was to report unconstitutional conduct by not only Police Department officers but also Sheriff's Office deputies.

10

enforcement officer] in Douglas County."   Viewed in a light most favorable to Bailey, this description, accompanied by Bailey's photograph, created the impression that Bailey was mentally unstable[9] and roaming Douglas County with a grudge against law-enforcement officers.   Then, after inciting law-enforcement officers to fear for their lives, the BOLO empowered these now-anxious officers to "act accordingly" upon coming into contact with Bailey.

Let's pause for a moment to appreciate just how a reasonable law-enforcement officer may have understood that instruction.   Under Georgia law, when a subject is armed and dangerous, an officer may shoot the subject in self-defense—a term Georgia construes as having justifiable intent to use such force as the officer reasonably believes to be necessary to prevent death or great bodily injury.  *See Smith v. LePage*, 834 F.3d 1285, 1298 (11th Cir. 2016); *see also Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999).  So, in other words, Wheeler's BOLO gave all Douglas County law-enforcement officers a reasonable basis for using force—including deadly force—against Bailey if they reasonably misconstrued a single move Bailey made—such as reaching into his pocket when confronted by

---

[9]  *See Loose cannon*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/loose%20cannon, at "Full Definition of LOOSE CANNON" (last visited Nov. 21, 2016); "a dangerously uncontrollable person or thing."

11

law-enforcement officers—as imperiling themselves or anyone else.[10]  We think that this situation, which potentially seriously endangered Bailey's life, easily would deter a person of ordinary firmness from exercising his First Amendment rights.

And we find that is especially the case here, considering the environment in which Wheeler issued the BOLO.  First, Bailey was an African-American law-enforcement officer who had protested civil-rights abuses by his fellow officers—the very people to whom the BOLO was distributed.

Second, Wheeler issued the BOLO on February 9, 2013.  Less than a week earlier, national news outlets had reported that Christopher Dorner, a former Los Angeles police officer, had raged against law enforcement and killed, among others, the daughter of a police chief he felt had wronged him.  *See, e.g.*, "Alleged Cop-killer Details Threats to LAPD and Why He Was Driven to Violence," http://www.cnn.com/2013/02/07/us/dorner-manifesto/ (last visited Nov. 21, 2016).  So when Wheeler issued the BOLO against Bailey, the story of Dorner—a former police officer like Bailey—and Dorner's violent turn against his former fellow officers, was fresh in the public's (and law enforcement's) awareness.  Wheeler's issuance of the BOLO in this environment raised the specter that Douglas County

---

[10] Indeed, if tragedy had ensued and an officer had shot Bailey after reasonably misconstruing something Bailey had done, that officer could have invoked the very BOLO at issue to justify his entitlement to qualified immunity.

12

might have its own Dorner in the form of Bailey and served to only amplify the urgency of the BOLO's warning. We need not engage in conjecture to conclude that any person of ordinary firmness would be deterred from exercising his First Amendment rights under these circumstances.

That brings us to the third element of Bailey's First Amendment claim—causation. Wheeler asserts that Bailey's operative complaint fails to establish causation both because it includes no allegations that Bailey made his complaints to anyone at the Sheriff's Office and, in Wheeler's view, because it contains no factual allegations that allow for the reasonable inference that Wheeler issued the BOLO in retaliation for Bailey's comments. We disagree.

As we have explained, a court reviewing a motion to dismiss must draw all reasonable inferences from the factual allegations in a plaintiff's complaint in the plaintiff's favor. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). When we do that in this case, we find that the operative complaint sufficiently establishes the causal connection between Bailey's complaints and Wheeler's issuance of the BOLO.

Bailey alleges that he complained about racial profiling and other unconstitutional behavior by Douglas County law-enforcement officers to his chief and again in his termination appeal. He further asserts that on the very day of the hearing on his termination appeal, of all days, Sheriff's Office deputies followed

13

him as he drove to and then entered an establishment, and they stared him down. And the next day, the complaint continues, both a Police Department vehicle and a Sheriff's Office vehicle followed Bailey as he drove his personal car. Also on that same day, the complaint avers, Wheeler issued the BOLO, describing Bailey as a "loose cannon," a term that, in addition to being employed to refer to a mentally unstable person, can be used to refer to "a person who cannot be controlled and who . . . **_says_** things that cause problems, embarrassment, etc., for others." *Loose cannon*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/loose%_20cannon, at "Simple Definition of LOOSE CANNON" (last visited Nov. 21, 2016) (emphasis added); *see also Loose cannon*, The American Heritage Dictionary (5th ed. 2011) ("One that is uncontrolled and therefore poses danger: '[His] *bloopers in the White House seem to make him . . . a political loose cannon*' (Tom Morgenthau)."). Finally, Bailey contends that when he returned to work a few weeks later, his chief informed him that Bailey could have the BOLO canceled by contacting the Sheriff's Office.

Viewed in the light most favorable to Bailey, these allegations allow for the reasonable inferences that the Police Department communicated with the Sheriff's Department about Bailey's complaints prior to Wheeler's issuance of the BOLO, that the Sheriff's Office and Wheeler knew about the termination-appeal hearing, and that Wheeler issued the BOLO at least in part in retaliation for Bailey's

14

complaints. As it pertains to the communications among law enforcement about Bailey's complaints, the timing of the Sheriff's Office's employees' following of Bailey and the issuance of the BOLO, the use of the term "loose cannon" in the BOLO, and the fact that Bailey's chief instructed him that Bailey could have the BOLO canceled by calling the Sheriff's Office all support this reasonable inference. Similarly, all of these allegations other than those relating to Bailey's having been followed can reasonably be read to support the inference that Wheeler knew about the termination-appeal hearing and that he issued the BOLO in retaliation for Bailey's reports that local law-enforcement officers had engaged in civil-rights abuses of minority citizens. For these reasons, we conclude that Bailey sufficiently alleged that Wheeler violated Bailey's First Amendment rights when he issued the BOLO.

B.    Bailey's constitutional right to be free from retaliation that imperiled his life was clearly established at the time that Wheeler issued the BOLO

We next consider whether Bailey's right to be free from retaliation in the form of the particular BOLO Wheeler issued in this case was clearly established. We find that it was.

A right is clearly established if a reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). Whether the official had "fair warning" and notice that his

15

conduct violated the constitutional right in question drives our inquiry. *Id.* at 1013, 1015; *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007).  In determining whether the law clearly establishes a right, we look to the binding precedent set forth in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state (Georgia, here), *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009), and we conduct our inquiry "in light of the specific context of the case, not as a broad general proposition," *Lee,* 284 F.3d at 1194.

We have said that a plaintiff may show that "the contours of the right were clearly established in [one of three] ways." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation and internal quotation marks omitted).  First, a plaintiff may identify a materially similar case from relevant precedent. *Id.*  When a plaintiff proceeds in this way, we consider "whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing a government official in a previous case." *Id.* (citation and internal quotation marks omitted).

Second, a plaintiff may rely on a "broader, clearly established principle [that] should control the novel facts [of the] situation." *Id.* at 1204-05 (citation and internal quotation marks omitted).  We have explained that when a plaintiff proceeds in this way, he must show that case law established the principle with "obvious clarity . . . so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law

16

when the official acted."  *Id.* at 1205 (citation and internal quotation marks omitted).  This category also applies when "[t]he reasoning, though not the holding of prior cases . . . send[s] the same message to reasonable officers in novel factual situations."  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citation and internal quotation marks omitted).

Finally, a plaintiff may satisfy the "clearly established" requirement when the defendant's conduct "lies so obviously at the very core of what the [First Amendment] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law."  *Loftus*, 690 F.3d at 1205 (citation and internal quotation marks omitted).  Similarly, we recognize the obvious-clarity exception where conduct is "so bad that case law is not needed to establish that the conduct cannot be lawful." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).

Here, the reasoning of *Bennett* and the broad principle it establishes should have put Wheeler on notice that he could not potentially endanger Bailey's life in retaliation for Bailey's exercise of his First Amendment rights.  But even if it did not, we think the conduct alleged in this case is so egregious that Wheeler did not need case law to know what he allegedly did was unlawful.

In *Bennett*, the defendant sheriff and his co-defendants allegedly used their law-enforcement positions to harass and retaliate against the plaintiffs after the

17

plaintiffs supported a county referendum that the sheriff opposed.  423 F.3d at 1248.  More specifically, the defendants followed, pulled over, cited, intimidated, and otherwise harassed the plaintiffs.  *Id.* at 1254.  In addition, they accessed confidential government databases containing information on the plaintiffs, attempted to obtain arrest warrants against the plaintiffs without probable cause, and distributed flyers that called the plaintiffs the "real criminals," members of a "chain gang," and "the same type of criminals that terrorize Forsyth County."  *Id.* at 1249.  We determined that this conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Id.* at 1254.

In reaching this conclusion, we emphasized Judge Posner's statement that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."  *Id.* at 1254 (citation and internal quotation marks omitted).  And we cited with approval cases from other circuits that concluded law-enforcement officers had violated plaintiffs' First Amendment rights by committing "similar or less harassing [retaliatory] acts."  *Id.* at 1255.

For example, we cited *Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003), which we described as holding that "the retaliatory issuance of parking tickets totaling $35 created a jury issue because the defendant 'engaged the punitive machinery of government in order to punish Ms. Garcia for her speaking

18

out.'" *Bennett*, 423 F.3d at 1255.  We similarly relied on *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), which we summarized as holding that a "'campaign of petty harassments' against the plaintiff[,] including '[h]olding her up to ridicule for bringing a birthday cake to the office' stated a cause of action for retaliation."

If a law-enforcement officer may not issue $35 in parking tickets or use his position to harass and intimidate individuals in retaliation for exercising their First Amendment rights, a law-enforcement officer certainly may not use his position to potentially seriously endanger a person's life in retaliation for exercising First Amendment rights.  We think that is obvious under the case law.

But even if it were not, it is certainly obvious, as a general proposition and without reference to case law, that issuing the BOLO Wheeler issued in this case, under the circumstances that existed at the time, allegedly in retaliation for Bailey's speaking up about alleged civil-rights abuses, clearly violated Bailey's First Amendment rights.  Law-enforcement officers are sworn to protect and defend the lives of others.  It is completely antithetical to those sworn duties for a law-enforcement officer to use his position to harness the power of an entire county's law-enforcement force to teach a lesson to—and potentially very seriously endanger—someone who had the temerity to speak up about alleged abuses.

For these reasons, we agree with the district court's assessment that the operative complaint sufficiently alleges that Wheeler violated Bailey's clearly established constitutional right.  So we affirm the district court's denial of Wheeler's motion to dismiss the § 1983 claim.

## IV.

Wheeler next argues that the district court erred in denying him official immunity on Bailey's state-law defamation claim. In  Georgia, county law-enforcement officers like Wheeler generally enjoy official immunity from suits alleging personal liability in tort for performance of official functions.  *See Eshleman v. Key*, 774 S.E.2d 96, 98 (Ga. 2015); *see also* Ga. Const. art. I, § 2, para. IX(d).  Under this immunity, a state official may not be held liable for injuries caused through his performance of discretionary functions unless he acts "with actual malice or with actual intent to cause injury."  Ga. Const. art. I, § 2, para. IX(d); *Brown v. Penland Constr. Co, Inc.*., 641 S.E.2d 522, 523 (Ga. 2007). Here, Bailey contends that Wheeler acted with actual malice in issuing the BOLO, and Wheeler responds that the complaint does not allege sufficient facts to reasonably infer actual malice.

In the context of Georgia's official immunity doctrine, "'actual malice' requires a deliberate intention to do wrong."  *Merrow v. Hawkins*, 467 S.E.2d 336, 337 (Ga. 1996).  It "does not include 'implied malice,' *i.e.*, the reckless disregard

20

for the rights or safety of others." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007). Instead, actual malice requires more than "harboring bad feelings" or "ill will" about another; "rather, ill will must also be combined with the intent to do something wrongful or illegal." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999). To overcome official immunity, a plaintiff's allegations must demonstrate that the defendant deliberately intended "to cause the harm suffered by the plaintiff[]"; it is not enough that the defendant merely intended to do the act purportedly resulting in the claimed injury. *Murphy*, 647 S.E.2d at 60; *see West v. Davis*, 767 F.3d 1063, 1073 (11th Cir. 2014) (quoting *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999)); *cf. Reed v. DeKalb Cty.*, 589 S.E.2d 584, 588 (Ga. Ct. App. 2003) (observing that a plaintiff bears the burden of overcoming official immunity).

We have already explained how, viewed in the light most favorable to Bailey, Bailey's allegations create the reasonable inference that Wheeler issued the BOLO to retaliate against Bailey for reporting that Douglas County law-enforcement officers were racially profiling minority citizens and otherwise violating their constitutional rights. Since Bailey's allegations suffice to create this reasonable inference, they necessarily are enough in the context of this case to establish the reasonable inference that Wheeler acted with actual malice in issuing the BOLO. After all, the BOLO Wheeler allegedly issued was enough to cause the

harm of deterring a person of ordinary firmness from exercising his First Amendment rights, and it had the potential to result in serious harm or even death to Bailey—facts that Wheeler must have known at the time that he issued the BOLO for the purpose of allegedly retaliating against Bailey. These allegations satisfy the showing of a deliberate intention to do wrong—that is, actual malice.

So we affirm the district court's denial of official immunity to Wheeler on Bailey's state-law defamation claim.

## V.

"Once a government is committed to the principle of silencing the voice of opposition, it has only one way to go, and that is down the path of increasingly repressive measures, until it becomes a source of terror to all its citizens and creates a country where everyone lives in fear." President Harry S. Truman, Special Message to the Congress on the Internal Security of the United States (Aug. 8, 1950). Our First Amendment demands that a law-enforcement officer may not use his powerful post to chill or punish speech he does not like. If he does so, he may not hide behind the veil of qualified immunity. We affirm the district court's denial of Wheeler's motion to dismiss Bailey's § 1983 and state-law defamation claims.

**AFFIRMED.**

22